

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: BARBARA A. WARD
    JOSHUA KLEIN
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Tel. (212) 637-1048/2397

**JUDGE KARAS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x

UNITED STATES OF AMERICA,            :

          Plaintiff,                 :

          - v -                      :     VERIFIED COMPLAINT

Up to $6,100,000 on Deposit in       :     07 Civ.
Account No. ⬤5876 at Bank
Julius Baer Co. Ltd (Guernsey        :
Branch); and
                                     :
Up to $3,651,339 on Deposit in       :
Account No. ⬤5568 at Bank
Julius Baer Co. Ltd (Guernsey        :
Branch),
                                     :
          Defendants in Rem.         :

----------------------------------x

Plaintiff United States of America, by its attorney, Michael

J. Garcia, United States Attorney for the Southern District of

New York, for its complaint alleges, upon information and belief,

as follows:

## I.  JURISDICTION AND VENUE

1.  This action is brought by the United States of America

pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984 seeking the

forfeiture of all right, title and interest in the following:

a.  Up to $6,100,000 on Deposit in Account
    No. ███5876 at Bank Julius Baer Co. Ltd
    (Guernsey Branch) (hereinafter,
    "Account A"; and

b.  Up to $3,651,339 on Deposit in Account
    No. ███5568 at Bank Julius Baer Co. Ltd
    (Guernsey Branch) (hereinafter,
    "Account B"),

(hereinafter referred to collectively as the "Defendant Funds").
Forfeiture is sought on the grounds that the Defendant Funds
constitute or are derived from proceeds traceable to fraud in the
sale of securities, in violation of 15 U.S.C. §§ 78j(b) and 78ff,
and 17 C.F.R. §§ 240.10b-5 and 240.105-2.

2.  This Court has jurisdiction over this action pursuant
to 28 U.S.C. §§ 1345 and 1355.

3.  Venue is proper pursuant to 28 U.S.C. § 1355 because
acts and omissions giving rise to the forfeiture occurred in the
Southern District of New York.

## II.  PROBABLE CAUSE FOR FORFEITURE

4.  On May 3, 2007, as a result of an investigation
conducted by the Federal Bureau of Investigation ("FBI"),
Criminal Complaint 07 Mag. 706 was filed in the Southern District
of New York charging Hafiz Muhammad Zubair Naseem with conspiracy
to commit fraud in connection with the purchase and sale of
securities, in violation of 18 U.S.C. § 371 (Count One); and
fraud in connection with the purchase and sale of securities, in
violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. 17

2

C.F.R. §§ 240.10b-5 and 240.10b5-2 (Counts Two through Twenty-Six).  On May 29, 2007, as a result of the same investigation, Criminal Complaint 07 Mag. 859 was filed in the Southern District of New York charging Ajaz Rahim with conspiracy to commit fraud in connection with the purchase and sale of securities, in violation of 18 U.S.C. § 371 (Count One); and fraud in connection with the purchase and sale of securities, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. 17 C.F.R. §§ 240.10b-5 and 240.10b5-2 (Counts Two through Twenty-Six).  A copy of each of these Criminal Complaints (referred to together as the "Complaints") is attached hereto as Exhibits A and B, respectively, and they are incorporated herein by reference as if set out in full.

        5.    The Complaints charged, in pertinent part, that:

            a.    From in or about April 2006 through in or about February 2007, Ajaz Rahim and Hafiz Muhammad Zubair Naseem, and others, participated in a scheme to defraud by executing securities transactions based on material, nonpublic information regarding forthcoming announcements relating to acquisitions of the following nine publicly traded companies:  Northwestern Corporation ("NWEC"), Energy Partners, Ltd. ("EPL"), Veritas DGC Inc. ("VTS"), Jacuzzi Brands, Inc. ("JJZ"),  Trammell Crow Co. ("TCC"), Hydril Company ("HYDL"), Caremark RX, Inc. ("CMX"), John H. Harland Co. ("JH"), and TXU Corp. ("TXU") (these companies are

collectively referred to as the "Issuers" and the securities in these companies are collectively referred to as the "Subject Securities").  (Complaints ¶ 12(a)).[1]

   b.   Credit Suisse was engaged to advise either the target company or the acquiring entity in connection with business combination transactions involving the Issuers (the "Subject Transactions").  Naseem, an investment banker who was a member of Credit Suisse's Global Energy Group, worked at a desk at Credit Suisse's offices in New York, New York, that was situated in close proximity to other members of the Global Energy Group.  Because many of the Subject Transactions were staffed by members of the Global Energy Group, Naseem had access to information about these transactions by virtue of his membership in the Global Energy Group.  Furthermore, Naseem had accessed to an internal Credit Suisse database that contained information about certain of these transactions.  (Complaints ¶ 12(b)).

   c.   Naseem regularly and repeatedly called Rahim and provided him with material non-public information regarding the Subject Transactions (the "Credit Suisse Inside Information") in violation of (a) the duties of trust and confidence owed by Naseem to Credit Suisse and its clients, and (b) Credit Suisse's

---

   [1]   The Complaints are substantially similar to one another and, except where otherwise noted, paragraph references refer to the same paragraph in both Complaints.

4

written policies regarding the use and safekeeping of confidential and inside information.  (Complaints ¶ 12(c)).

        d.    The means by which Naseem and Rahim effectuated the fraudulent scheme were as follows: Naseem would typically call Rahim at his home or on Rahim's cell phone in advance of a public announcement that a particular Issuer was to be acquired by another entity and he would provide Credit Suisse Inside Information to Rahim regarding the acquisition in question. Shortly after receiving such a call Rahim would purchase securities in that Issuer based on the Credit Suisse Inside Information he received from Naseem.  Following public disclosure that an Issuer was being acquired -- which always occurred after Rahim had already purchased securities in that particular Issuer -- Rahim would quickly sell all of the securities he had purchased in advance of the public disclosures.  Rahim executed dozens of securities transactions, including trades in an offshore account, based on Credit Suisse Inside Information and profited from his trading in each of the Subject Securities. Rahim earned total profits in excess of $7.5 million from the scheme.  (Complaints ¶ 12(d)).

      6.    The Complaints detailed numerous occasions on which telephone calls were made from a Credit Suisse telephone number assigned to Naseem to phone numbers associated with Rahim shortly before Rahim executed trades in the Subject Securities.  (See,

e.g., id. ¶¶ 15, 19, 21, 23, 25, 27).  The Complaints further described how Naseem sold all of these securities at or about the time that news of the Subject Transactions was released to the public.  (See, e.g., id.).

7.   At all times relevant to the allegations set forth in the Complaints, Naseem worked in Manhattan and lived in Ryebrook, New York.  The telephone calls from Naseem's Credit Suisse telephone to the telephone numbers associated with Rahim were made from Credit Suisse's offices in New York, New York.  Moreover, several of the Subject Securities traded on the New York Stock Exchange.  (See, e.g., id. ¶ 7).

8.   Based on information obtained during the FBI's investigation, directly and indirectly, from a number of sources, including information provided by the Securities and Exchange Commission, business records and other documents obtained from various entities, and publicly available information, the FBI has learned, among other things, that Rahim executed trades in four of the nine Subject Securities - John Harland, Hydril, Caremark and TXU - in Accounts A and B following calls from Naseem's Credit Suisse telephone number to telephone numbers associated with Rahim.  Proceeds from the sale of those securities were deposited in the accounts.  Specifically, $6,100,000 in proceeds from such sales was deposited in Account A, and $3,651,339 was deposited in Account B.

6

### III.    CLAIM FOR FORFEITURE

9.    Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in paragraphs one through eight of this Verified Complaint.

10.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in Section 1956(c)(7) of [title 18]), or a conspiracy to commit such offense," is subject to forfeiture to the United States.

11.    "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense listed under 18 U.S.C. § 1961(1).  Section 1961(1) lists, among other offenses, "fraud in the sale of securities."

12.    Title 18, United States Code, Section 984 provides, in pertinent part, that

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals –
>
> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
>
> (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

7

(2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

13.    The Defendant in Rem is subject to forfeiture pursuant to 18 U.S.C. S 981(a)(1)(C) because there is probable cause to believe that it constitutes or is derived from proceeds traceable to an offense constituting specified unlawful activity, to wit, fraud in the sale of securities, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. §§ 240.10b-5 and 240.10b5-2.

14.    By reason of the foregoing, the Defendant in Rem became and is subject to forfeiture to the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984.

WHEREFORE, Plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant in Rem and that all persons having an interest in the Defendant in Rem be required to appear and show cause why the forfeiture of the Defendant in Rem should not be decreed, that this Court decree forfeiture of the Defendant in Rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as it may deem just and proper, together with the costs and disbursements of this action.

Dated:  New York, New York
        May 29, 2007

                         MICHAEL J. GARCIA
                         United States Attorney for the
                         Southern District of New York
                         Attorney for the Plaintiff
                         United States of America


               By:  _Barbara A. Ward_____
                         BARBARA A. WARD
                         JOSHUA KLEIN
                         Assistant United States Attorneys
                         One St. Andrew's Plaza
                         New York, New York  10007
                         Telephone Nos.: 212-637-1048/2397

9

VERIFICATION

STATE OF NEW YORK              )
COUNTY OF NEW YORK             )
SOUTHERN DISTRICT OF NEW YORK  )


   Paul Higgins, being duly sworn, deposes and says that

he is a Special Agent with the Federal Bureau of Investigation

and as such has responsibility for the within action; that he has

read the foregoing Verified Complaint and knows the contents

thereof, and that the same is true to the best of his own

knowledge, information and belief.

   The sources of deponent's information and the ground of his

belief are official records and files of the United States and

information obtained directly by deponent during an investigation

of alleged violations of Titles 15 and 18, United States Code.

_____
Paul Higgins
Special Agent
Federal Bureau of Investigation


Sworn to before me this
29th day of May, 2007:

_____
NOTARY PUBLIC
AMY K. CRANGE
Notary Public, State of New York
No. 02FI6044104
Qualified in New York County
Commission Expires June 26, 2010

# EXHIBIT A

07 MAG    706

Approved:    _____
            JOSHUA KLEIN
            Assistant United States Attorney

Before:     HONORABLE THEODORE H. KATZ
            United States Magistrate Judge
            Southern District of New York

- - - - - - - - - - - - - - - - - - - - x
                                        :
UNITED STATES OF AMERICA                :    COMPLAINT
                                        :
        -v.-                            :    Violations of
                                        :    18 U.S.C. § 371;
HAFIZ MUHAMMAD ZUBAIR NASEEM,           :    15 U.S.C. §§ 78j(b),
                                        :    78ff; 17 C.F.R. §§
                                        :    240.10b-5, 240.10b5-
                                        :    2
                                        :
            Defendant.                  :    COUNTY OF OFFENSE:
                                        :    NEW YORK
                                        :
- - - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        PAUL HIGGINS, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation and
charges as follows:

## COUNT ONE

### (Conspiracy)

        1.    From at least in or about April 2006 up to and
including in or about February 2007, in the Southern District of
New York and elsewhere, HAFIZ MUHAMMAD ZUBAIR NASEEM, the
defendant, and others known and unknown, unlawfully, willfully,
and knowingly did combine, conspire, confederate and agree
together and with each other to commit offenses against the United
States, to wit, securities fraud, in violation of Title
15, United States Code, Sections 78j(b) & 78ff, and Title 17,
Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

        2.    It was a part and object of the conspiracy that
HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, and others known and
unknown, unlawfully, willfully and knowingly, directly and
indirectly, by the use of means and instrumentalities of
interstate commerce, and of the mails, and of facilities of
national securities exchanges, would and did use and employ, in

connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon the purchaser and seller, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Overt Acts

3.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    At certain times during 2006, Credit Suisse Securities, USA, LLC ("Credit Suisse") was engaged to advise a company called Northwestern Corporation (doing business as "Northwestern Energy"), a public company whose stock is traded on the NASDAQ under the symbol "NWEC," on a pending acquisition by an Australian utility infrastructure company called Babcock & Brown Infrastructure;

b.    On or about Friday, April 21, 2006, a telephone call was made from a Credit Suisse telephone in New York, New York that was assigned to HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, an investment banker employed by Credit Suisse, to a telephone associated with a co-conspirator not named herein as a defendant ("CC-1");[1]

c.    On or about Monday, April 24, 2006, a telephone call was made from the Credit Suisse phone assigned to NASEEM to the phone associated with CC-1;

d.    On or about April 24, 2006, following the telephone call from the Credit Suisse phone assigned to NASEEM to the phone associated with CC-1, CC-1 purchased 16,000 shares of stock in Northwestern Corporation at a cost of between $31.04 and

---

[1]    Paragraph 14 below explains, in greater detail, the basis for my knowledge that the telephone calls at issue emanated from a phone assigned to NASEEM and were placed to a phone associated with CC-1.

$31.69 per share, for a total cost of approximately $508,788;

    e. On or about April 25, 2006 Northwestern Corporation announced that the company had reached a definitive agreement with Babcock & Brown Infrastructure, a utility infrastructure company based in Sydney, Australia, (which trades on the Australian Stock Exchange under the symbol "BBI") pursuant to which Babcock would acquire Northwestern Corporation in an all cash transaction at $37 per share;

    f. On or about April 26, 2006, CC-1 sold 16,000 shares in Northwestern, at an average price of approximately $35.05 per share, reaping total proceeds of approximately $560,800 and a profit of approximately $53,760;[2]

    g. On or about June 20, 2006, CC-1 purchased 1,000 shares of stock in Veritas DGC, Inc.

    h. On or about July 21, 2006, CC-1 purchased 2,000 shares of stock in Energy Partners, Ltd.

    i. On or about September 13, 2006, CC-1 purchased 5,000 shares of stock in Jacuzzi Brands, Inc.

    j. On or about October 16, 2006, CC-1 purchased 2,000 shares of stock in Tramell Crow Co.

    k. On or about December 5, 2006, CC-1 purchased 5,000 shares of stock in John H. Harland Co.

    l. On or about February 5, 2007, CC-1 purchased 15,000 shares of stock in Hydril Company.

    m. On or about February 23, 2007, CC-1 purchased 15,000 shares of stock in TXU Corp.

    (Title 18, United States Code, Section 371.)

---

  [2] CC-1 also purchased an additional 4,000 shares of Northwestern Corporation earlier in April 2006, following telephone calls from the Credit Suisse phone assigned to NASEEM to the telephone numbers associated with CC-1. CC-1 sold these 4,000 shares of Northwestern Corporation on April 26, 2006, along with the 16,000 shares described above for an additional profit of approximately $15,880.

## COUNTS TWO THROUGH TWENTY-SIX

(Securities Fraud)

4.    On or about the dates set forth below, in the
Southern District of New York and elsewhere, HAFIZ MUHAMMAD ZUBAIR
NASEEM, the defendant, unlawfully, willfully and knowingly,
directly and indirectly, by use of the means and instrumentalities
of interstate commerce, the mails and the facilities of national
securities exchanges, in connection with the purchase and sale of
securities, did use and employ manipulative and deceptive devices
and contrivances, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices, schemes
and artifices to defraud; (b) making untrue statements of material
facts and omitting to state material facts necessary in order to
make the statements made, in the light of the circumstances under
which they were made, not misleading; and (c) engaging in acts,
practices and courses of business which operated and would operate
as a fraud and deceit upon persons, to wit, NASEEM caused CC-1 to
execute the securities transactions listed below based on
material, nonpublic information.

| COUNT | DATE | SECURITY | TRANSACTION |
|-------|------|----------|-------------|
| TWO | April 6, 2006 | Northwestern Corporation | purchased 2,000 shares |
| THREE | April 7, 2006 | Northwestern Corporation | purchased 2,000 shares |
| FOUR | April 24, 2006 | Northwestern Corporation | purchased 16,000 shares |
| FIVE | June 20, 2006 | Veritas DGC, Inc. | purchased 1,000 shares |
| SIX | July 5, 2006 | Veritas DGC, Inc. | purchased 1,000 shares |
| SEVEN | July 5, 2006 | Veritas DGC, Inc. | purchased 500 shares |
| EIGHT | July 10, 2006 | Veritas DGC, Inc. | purchased 1,000 shares |
| NINE | July 21, 2006 | Veritas DGC, Inc. | purchased 1,000 shares |

4

| TEN | July 21, 2006 | Energy Partners, Ltd. | purchased 1,000 shares |
|---|---|---|---|
| ELEVEN | July 25, 2006 | Energy Partners, Ltd. | purchased 2,000 shares |
| TWELVE | July 26, 2006 | Energy Partners, Ltd. | purchased 2000 shares |
| THIRTEEN | July 27, 2006 | Energy Partners, Ltd. | purchased 3,000 shares |
| FOURTEEN | July 27, 2006 | Energy Partners, Ltd. | purchased 3,000 shares |
| FIFTEEN | August 31, 2006 | Veritas DGC, Inc. | purchased 6,000 shares |
| SIXTEEN | September 13, 2006 | Jacuzzi Brands, Inc. | purchased 5,000 shares |
| SEVENTEEN | September 15, 2006 | Jacuzzi Brands, Inc. | purchased 20,000 shares |
| EIGHTEEN | September 20, 2006 | Jacuzzi Brands, Inc. | purchased 5,000 shares |
| NINETEEN | October 9, 2006 | Jacuzzi Brands, Inc. | purchased 5,000 shares |
| TWENTY | October 16, 2006 | Tramell Crow Company | purchased 2,000 shares |
| TWENTY-ONE | October 17, 2006 | Tramell Crow Company | purchased 8,000 shares |
| TWENTY-TWO | December 5, 2006 | John H. Harland Co. | purchased 5,000 shares |
| TWENTY-THREE | December 6, 2006 | John H. Harland Co. | purchased 15,000 shares |
| TWENTY-FOUR | December 7, 2006 | John H. Harland Co. | purchased 5,000 shares |
| TWENTY-FIVE | February 5, 2007 | Hydril Company | purchased 15,000 shares |
| TWENTY-SIX | February 8, 2007 | Hydril Company | purchased 5,000 shares |

5

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2, and Title 18, United States Code, Section 2).

The basis for my knowledge and the foregoing charge is,
in part, as follows:

5.    I have been a Special Agent with the Federal Bureau
of Investigation for approximately seventeen years.  I am
currently assigned to a squad responsible for investigating
violations of the federal securities laws and related offenses.  I
have participated in numerous investigations of such offenses, and
I have made and participated in making arrests of numerous
individuals for participating in such offenses.

6.    The information contained in this affidavit is based
upon my personal knowledge, as well as information obtained during
this investigation, directly or indirectly, from other sources,
including: (a) information provided to me by the United States
Securities and Exchange Commission (the "SEC"), which includes
information obtained from the New York Stock Exchange ("NYSE"),
the Chicago Board of Options Exchange ("CBOE"), and Credit Suisse;
(b) business records and other documents obtained from various
entities, including Credit Suisse and certain other broker-
dealers; and (c) publicly-available documents.  Because this
affidavit is prepared for limited purposes, I have not set forth
each and every fact I have learned in connection with this
investigation.  Where conversations and events are referred to
herein, they are related in substance and in part.  Where figures
and calculations are set forth herein, they are approximate.

### Relevant Entities and Individuals

7.    Based on information obtained from the SEC
(including information provided to the SEC by Credit Suisse),
documents publicly filed with the SEC, and public announcements
made by certain of the entities identified below, I am aware of
the following:

a.    At all times relevant to this Complaint,
Credit Suisse, a wholly owned subsidiary of Credit Suisse Bank,
operated as an investment bank and broker-dealer, located in New
York, New York.  At all times relevant to this Complaint, a
significant portion of Credit Suisse's business was devoted to
advising corporations on various financings and business related
transactions.

b.    At all times relevant to this Complaint, HAFIZ

6

MUHAMMAD ZUBAIR NASEEM, the defendant, a Pakistani national working in the United States, was employed by Credit Suisse in the firm's Investment Banking Division, in the Global Energy Group.

c.    At certain times relevant to this Complaint, Northwestern Corporation (doing business as Northwestern Energy), a public company whose stock traded on the NASDAQ under the symbol "NWEC," operated as a provider of electricity and natural gas in the upper midwest and northwest.

d.    At certain times relevant to this Complaint, Energy Partners, Ltd., whose stock traded on the NYSE under the symbol "EPL," operated as an independent oil and natural gas exploration and production company.

e.    At certain times relevant to this Complaint, Veritas DGC Inc., a public company whose stock traded on the NYSE under the symbol "VTS," operated as a provider of integrated geophysical information and services to the petroleum industry worldwide.

f.    At certain times relevant to this Complaint, Jacuzzi Brands, Inc., a public company whose stock traded on the NYSE under the symbol "JJZ," operated as a manufacturer and distributor of branded bath and plumbing products for the residential, commercial and institutional markets.

g.    At certain times relevant to this Complaint, Trammell Crow Co., a public company whose stock traded on the NYSE under the symbol "TCC," operated a property management business.

h.    At certain times relevant to this Complaint, Caremark RX, Inc., a public company whose stock traded on the NYSE under the symbol "CMX," operated as a pharmacy benefits management company.

i.    At certain times relevant to this Complaint, John H. Harland Co., a public company whose stock traded on the NYSE under the symbol "JH," operated as a provider of printed products and software and related services sold to the financial institution market.

j.    At certain times relevant to this Complaint, Hydril Company, a public company whose stock traded on the NASDAQ market under the symbol "HYDL," operated as a manufacturer of premium connections and pressure control products for oil and gas drilling production.

k.    At certain times relevant to this Complaint, TXU Corp., a public company whose stock traded on the NYSE under the symbol "TXU," operated as the largest electricity producer in Texas.

## Credit Suisse's Confidentiality Policy

8.    Based on information obtained from Credit Suisse, I am aware that at all times relevant to this Complaint, Credit Suisse maintained written policies prohibiting the premature dissemination of material non-public and confidential information relating to pending transactions and financings in which Credit Suisse was involved.  At or about the time HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, commenced his employment at Credit Suisse, he was provided with a copy of Credit Suisse's "Global Business Conduct Manual," and certified that he had read the document. NASEEM also signed a "Confidential Information and Proprietary Information Acknowledgment" in which he specifically acknowledged his understanding of various Credit Suisse policies and his obligation to comport with these policies as a Credit Suisse employee.  Among other things, NASEEM acknowledged that:

> I understand it is a criminal offense to trade
> or encourage others to trade on inside
> information.  I also may face civil liability
> and regulatory sanctions for disclosing or
> using Confidential and Proprietary information
> inappropriately.

9.    The Global Business Conduct Manual defined "inside information" as information that "relates to the securities of an issuer or group of issuers, is not publicly known and is material."  The Manual defined as "material for this purpose" information that "if made public, would likely have a significant impact on the price of the security, or a reasonable investor would consider important in deciding whether to purchase, hold or sell the security."

10.   Furthermore, the Global Business Conduct Manual specifically admonished that "if you have inside information, you generally may not trade or deal in the securities in question, encourage others to trade or deal in the securities in question, or reveal or 'tip' the information to another person, other than in the proper performance of your job."

11.   Finally, the Global Business Conduct Manual warned that "failure to strictly observe the laws and rules regarding inside information is a criminal offense in many jurisdictions

8

where Credit Suisse conducts business."

## **Insider Trading Scheme**

### General Overview

12.    Based on all of the sources of information referenced herein, including all of the facts and circumstances described in detail below, I have probable cause to believe the following:

a.    From in or about April 2006 through in or about February 2007, HAFIZ MUHAMMAD ZUBAIR NASEEM the defendant, and CC-1, and others, known and unknown, participated in a scheme to defraud by executing securities transactions based on material, nonpublic information regarding forthcoming announcements relating to acquisitions of the following nine publicly traded companies: Northwestern Corporation ("NWEC"), Energy Partners, Ltd. ("EPL"), Veritas DGC Inc. ("VTS"), Jacuzzi Brands, Inc. ("JJZ"), Trammell Crow Co. ("TCC"), Hydril Company ("HYDL"), Caremark RX, Inc. ("CMX"), John H. Harland Co. ("JH"), and TXU Corp. ("TXU") (these companies are collectively referred to as the "Issuers" and the securities in these companies are collectively referred to as the "Subject Securities").

b.    Credit Suisse was engaged to advise either the target company or the acquiring entity in connection with business combination transactions involving the Issuers (the "Subject Transactions").  NASEEM, who was a member of Credit Suisse's Global Energy Group, worked at a desk at Credit Suisse's offices in New York, New York, that was situated in close proximity to other members of the Global Energy Group.  Because many of the Subject Transactions were staffed by members of the Global Energy Group, NASEEM had access to information about these transactions by virtue of his membership in the Global Energy Group. Furthermore, NASEEM's desk was situated near a printer that was used in connection with certain of the Subject Transactions that were not staffed by the members of the Global Energy Group. Consequently, NASEEM had access to information about these transactions as well.[3]

_____

[3]  For various reasons concerning the investigation of this matter, Credit Suisse has been asked to refrain from alerting certain known members of the deal teams who worked on the Subject Transactions as to the existence of this investigation. Consequently, I do not yet know whether NASEEM was assigned to work on any of the Subject Transactions.

    c. NASEEM regularly and repeatedly called CC-1 and provided him with material non-public information regarding the Subject Transactions (the "Credit Suisse Inside Information"). NASEEM provided the Credit Suisse Inside Information to CC-1 in violation of (a) the duties of trust and confidence owed by NASEEM to Credit Suisse and its clients, and (b) Credit Suisse's written policies regarding the use and safekeeping of confidential and inside information.

    d. The means by which NASEEM and CC-1 effectuated the fraudulent scheme were as follows:  NASEEM would typically call CC-1 at his home or on CC-1's cell phone in advance of a public announcement that a particular Issuer was to be acquired by another entity and he would provide Credit Suisse Inside Information to CC-1 regarding the acquisition in question.[4] Shortly after receiving such a call CC-1 would purchase securities in that Issuer based on the Credit Suisse Inside Information he received from NASEEM.  Following public disclosure that an Issuer was being acquired -- which always occurred after CC-1 had already purchased securities in that particular Issuer -- CC-1 would quickly sell all of the securities he had purchased in advance of the public disclosures.  CC-1 executed dozens of securities transactions, including trades in an offshore account, based on Credit Suisse Inside Information and profited from his trading in each of the Subject Securities.  CC-1 earned total profits in excess of $7.5 million from the scheme.

<u>Insider Trading In The Securities Of Northwestern Corporation</u>

    13. Based on conversations with an SEC attorney (the "SEC Attorney"), who relayed to me information he obtained from a Credit Suisse employee,[5] I have learned that Credit Suisse was engaged to advise Northwestern Corporation in connection with a pending acquisition of Northwestern Corporation by an Australian utility infrastructure company called Babcock & Brown

---

  [4] Based on conversations with an SEC Attorney, who relayed to me information he obtained from an employee of Credit Suisse, I have learned that during all times relevant to this Complaint, Credit Suisse had no business relationship with CC-1 or his employer.

  [5] I have spoken with the SEC Attorney on multiple occasions in connection with this investigation.  During the course of these conversations, the SEC Attorney relayed to me, among other things, information he obtained from a Credit Suisse employee, and information he obtained from the CBOE and the NYSE.

Infrastructure.

14. Based on my review of brokerage account records for CC-1 (the "CC-1 Account Records"), I have learned that CC-1 provided two telephone numbers to a broker dealer which he described as the telephone numbers for his cell phone and residence (the "CC-1 Telephone Numbers"). Based on a conversation with the SEC Attorney, who relayed to me information he obtained from a Credit Suisse employee, I know that Credit Suisse assigned a particular office telephone number to HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, which number remained assigned to NASEEM during all times relevant to this Complaint (the "Naseem Telephone Number").

15. Based on my review of a summary of telephone records that was provided by Credit Suisse (the "Credit Suisse Telephone Summary") and the CC-1 Account Records I, have learned that between April 5, 2006 and April 24, 2006, there were 11 telephone calls made from the Naseem Telephone Number to the CC-1 Telephone Numbers, including, among others, calls on April 6, April 7, and April 24. CC-1 purchased a total of 20,000 shares of Northwestern Corporation on those very same dates -- April 6, April 7, and April 24[6] -- at a price per share that ranged from $31.04 to $31.69, for a total cost of approximately $631,360. Set forth below are the times at which these trades were executed[7] relative to the times on which CC-1 spoke to NASEEM on April 6, 7, and 24:

| Date | Event |
|------|-------|
| April 6, 2006 | 9:38 a.m. call from NASEEM to CC-1[8] |

---

[6] CC-1 purchased 2,000 shares on April 6, 2,000 shares on April 7, and 16,000 shares on April 24.

[7] Based on my review of the CC-1 Account Records, and information I obtained from the SEC Attorney, it appears that a substantial portion of the stock trades described herein were executed on the NYSE in New York, New York.

[8] The phrase "call from NASEEM to CC-1" as it appears throughout various charts in this Complaint is intended as shorthand to denote an entry on the Credit Suisse Telephone Summary of a call from the Naseem Telephone Number to one of the CC-1 Telephone Numbers.

| April 6, 2006 | 10:25 a.m. CC-1 purchases 2,000 shares of NWEC |
| --- | --- |
| | |
| April 7, 2006 | 9:30 a.m. call from NASEEM to CC-1 |
| April 7, 2006 | 10:06 a.m. CC-1 purchases 2,000 shares of NWEC |
| | |
| April 24, 2006 | 2:32 p.m. call from NASEEM to CC-1 |
| April 24, 2006 | 2:43 p.m.  CC-1 purchases 16,000 shares of NWEC |
| April 24, 2006 | 2:46 p.m. call from NASEEM to CC-1 |

16.   Based on conversations with the SEC Attorney, my review of news reports, and the CC-1 Account Records, I have learned that on April 25, 2006, the Board of Directors of Northwestern Corporation announced that the company had reached a "definitive agreement" with Babcock & Brown Infrastructure under which Babcock & Brown would acquire Northwestern in an all cash transaction for $37 per share.  On April 26, 2006, CC-1 sold all 20,000 shares of Northwestern Corporation that he had purchased in the days preceding the April 25 news announcement at an average price of approximately $35.05 per share, reaping total proceeds of $701,000.  CC-1 earned profits of approximately $69,640 from the sale of his Northwestern Corporation securities.

17.   In addition, based on my review of Credit Suisse documents, including emails dated May 24, 2006 and May 25, 2006, it appears that shortly after the Northwestern Corporation transaction, HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, sought to open an account at a financial institution that I believe to be located in Pakistan, and to authorize CC-1 to operate the account. Specifically, NASEEM provided an account opening document to an individual at this financial institution which listed CC-1 as a person authorized to operate the account.  Furthermore, NASEEM stated in one of the emails I reviewed that he had "authorized [CC-1] to operate" the account.  After confirming that CC-1 "can do whatever he wants" NASEEM concluded one of the emails with the comment "let the fun begin."  I have not obtained account records pertaining to this account and therefore do not know what, if any, trading occurred in this account.

12

18. Based on the foregoing, I have probable cause to believe that HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, provided Credit Suisse Inside Information to CC-1 in or about April 2006 in connection with the pending acquisition of Northwestern Corporation and that CC-1 executed trades in the securities of Northwestern Corporation based on the Credit Suisse Inside Information he obtained from NASEEM.

<u>Insider Trading In The Securities Of
Veritas DGC, Inc. and Energy Partners, Ltd.</u>

19. Based on conversations with the SEC Attorney, who relayed to me information he obtained from a Credit Suisse employee, and my review of the CC-1 Account Records, the Credit Suisse Telephone Summary, and public news announcements, I have learned the following:

a. Credit Suisse was engaged to advise: (i) Compagnie Generale de Geophysique, SA, a French surveyor of oil and gas fields, in connection with a pending acquisition of Veritas DGC, Inc., and (ii) Stone Energy Corporation in connection with a pending acquisition of Energy Partners, Ltd.

b. Between June 2006 and September 2006 there were numerous telephone calls from the Naseem Telephone Number to the CC-1 Telephone Numbers. At or about the time of many of these calls, CC-1 purchased securities in Veritas DGC and Energy Partners, Ltd., as set forth below:

| Date | Event[9] |
|---|---|
| June 20, 2006 | 12:37 p.m. phone call from Naseem Telephone Number to CC-1 Telephone Number |
| June 20, 2006 | 12:48 p.m. CC-1 purchases 1,000 shares of VTS |
| | |
| July 5, 2006 | 10:17 a.m. phone call from NASEEM to CC-1 |
| July 5, 2006 | 10:59 a.m. CC-1 purchases 1,000 shares of VTS |

---

[9] The telephone traffic between NASEEM and CC-1 during this time frame exceeded the specific calls identified in this chart.

13

| | |
|---|---|
| July 5, 2006 | 11:36 a.m. phone call from NASEEM to CC-1 |
| July 5, 2006 | 11:44 a.m. CC-1 purchases 500 shares of VTS |
| | |
| July 10, 2006 | 9:25 a.m. phone call from NASEEM to CC-1 |
| July 10, 2006 | 11:09 a.m. phone call from NASEEM to CC-1 |
| July 10, 2006 | 11:11 a.m. phone call from NASEEM to CC-1 |
| July 10, 2006 | 12:29 p.m. CC-1 purchases 1,000 shares of VTS |
| | |
| July 21, 2006 | 10:11 a.m. phone call from NASEEM to CC-1 |
| July 21, 2006 | 11:47 a.m. phone call from NASEEM to CC-1 |
| July 21, 2006 | 11:53 a.m. CC-1 purchases 1,000 shares of VTS and 2,000 shares of EPL |
| | |
| July 25, 2006 | 10:28 a.m. phone call from NASEEM to CC-1 |
| July 25, 2006 | 11:27 a.m. phone call from NASEEM to CC-1 |
| July 25, 2006 | 11:36 A.M. CC-1 purchases 2,000 shares of EPL |
| | |
| July 26, 2006 | 12:31 p.m. phone call from NASEEM to CC-1 |
| July 26, 2006 | 1:56 p.m. phone call from NASEEM to CC-1 |
| July 26, 2006 | 2:02 p.m. CC-1 purchases 2,000 shares of EPL |

14

| | |
|---|---|
| July 27, 2006 | 9:54 a.m. phone call from NASEEM to CC-1 |
| July 27, 2006 | 9:59 a.m. CC-1 purchases 3,000 shares of EPL |
| July 27, 2006 | 2:41 p.m. phone call from NASEEM to CC-1 |
| July 27, 2006 | 3:41 p.m. CC-1 purchases 3,000 shares of EPL |

c.    In addition to CC-1's purchases of Veritas DGC, Inc. and Energy Partners, Ltd. securities as set forth above, CC-1 purchased an additional 8,000 shares of Energy Partners, Ltd. between August 2, 2006 and August 22, 2006, thereby bringing the total of Energy Partners shares purchased to 20,000. These shares were purchased at prices that ranged from approximately $16.70 per share to approximately $18.83 per share, for a total cost of approximately $358,709.

d.    On August 25, 2006, Energy Partners, Ltd. and Stone Energy Corporation, an oil and gas company, announced a proposed merger of their companies. On August 28, 2006, CC-1 sold all 20,000 shares of Energy Partners he had accumulated prior to the news announcement at an average price of $24.50 per share, thus reaping total proceeds of $490,000 and profits of approximately $131,290 from the sale of these securities.

e.    Between August 11, 2006 and August 31, 2006, CC-1 purchased an additional 20,500 shares of Veritas DGC, Inc., thereby bringing the total of Veritas shares purchased to 25,000. These shares were purchased at prices that ranged from approximately $46.40 per share to approximately $60.62 per share, at a total cost of approximately $1,399,765.[10]

f.    On September 5, 2006, Compagnie Generale de Geophysique SA announced that it planned to acquire Veritas DGC Inc. for $75 per share in stock and cash. Following the news announcement on that day, CC-1 sold 15,000 shares of Veritas DGC, Inc., at an average price of approximately $70.03 per share. The

_____

[10]    6,000 of these additional shares were purchased on August 31, 2006, a date on which there were two calls from the Naseem Telephone Number to the CC-1 Telephone Numbers, including a call approximately a half hour prior to the trade.

15

next day CC-1 sold his remaining 10,000 shares of Veritas at an average price per share of approximately $70.50 per share.  CC-1 reaped total proceeds of approximately $1,755,451.50, and total profits of approximately $355,686.50 from the sale of his Veritas shares.

20.  Based on the foregoing, I have probable cause to believe that HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, provided Credit Suisse Inside Information to CC-1 from in or about June 2006 through in or about September 2006 in connection with (i) Credit Suisse's work on the pending acquisition of Veritas DGC, Inc. by Compagnie Generale de Geophysicque, SA, and (ii) the merger of Energy Partners, Ltd., with Stone Energy Corporation, and that CC-1 executed trades in the securities of Veritas DGC, Inc. and Energy Partners, Ltd. based on the Credit Suisse Inside Information he obtained from NASEEM.

### Insider Trading In The Securities Of Jacuzzi Brands, Inc.

21.  Based on conversations with the SEC Attorney, who relayed to me information he obtained from a Credit Suisse employee, and my review of the CC-1 Account Records, the Credit Suisse Telephone Summary, and public news announcements, I have learned the following:

a.  Credit Suisse was engaged to advise private equity firm Apollo Management L.P.  in connection with an acquisition of Jacuzzi Brands, Inc.

b.  Between September 6, 2006 and October 11, 2006, there were numerous telephone calls from the Naseem Telephone Number to the CC-1 Telephone Numbers.  At or about the time of many of these calls, CC-1 purchased stock in Jacuzzi Brands, Inc. as set forth below:

| Date | Event |
| --- | --- |
| September 13, 2006 | 9:36 a.m. phone call from NASEEM to CC-1 |
| September 13, 2006 | 9:44 a.m. CC-1 purchases 5,000 shares of JJZ |
| | |
| September 15, 2006 | 10:16 a.m. phone call from NASEEM to CC-1 |

16

| September 15, 2006 | 12:05 p.m. phone call from NASEEM to CC-1 |
|---|---|
| September 15, 2006 | 12:15 p.m. CC-1 purchases 20,000 shares of JJZ |
| | |
| September 20, 2006 | 10:11 a.m. phone call from NASEEM to CC-1 |
| September 20, 2006 | 10:23 a.m. CC-1 purchases 5,000 shares of JJZ |
| | |
| October 9, 2006 | 9:59 a.m. phone call from NASEEM to CC-1 |
| October 9, 2006 | 10:05 a.m. CC-1 purchases 5,000 shares of JJZ |

c.    As discussed above, CC-1 purchased a total of 35,000 shares of Jacuzzi Brands, Inc.  These purchases were made at prices ranging from $10.28 per share to $10.60 per share, for a total cost of approximately $361,524.

d.    On October 11, 2006,[11] Jacuzzi Brands, Inc. announced that Apollo Management L.P. would purchase the company at a price of $12.50 per share.  Following the news announcement on that day CC-1 sold all 35,000 shares of Jacuzzi Brands that he had purchased in advance of the news announcement, at an average price of $12.03 per share.  CC-1 reaped total proceeds of $421,050, and total profits of $59,526 from the sale of his Jacuzzi Brands shares.

22.    Based on the foregoing, I have probable cause to believe that HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, provided Credit Suisse Inside Information to CC-1 from in or about September 2006 through in or about October 2006, in connection with Credit Suisse's work on the pending acquisition of Jacuzzi Brands, Inc. by Apollo Management L.P., and that CC-1 executed trades in the securities of Jacuzzi Brands, Inc. based on the Credit Suisse Inside Information he obtained from NASEEM.

---

[11]    There were two calls from Naseem's secretary's telephone to the CC-1 Telephone Numbers on October 11, 2006.

17

## Insider Trading In The Securities Of Trammell Crow Company

23.    Based on conversations with the SEC Attorney, who relayed to me information obtained from a Credit Suisse employee, and my review of the CC-1 Account Records, the Credit Suisse Telephone Summary, and public news announcements, I have learned the following:

a.    Credit Suisse was retained to advise real estate company CB Richard Ellis Group, Inc. in connection with a pending acquisition of Trammell Crow Co.

b.    There were two telephone calls from the Naseem Telephone Number to the CC-1 Telephone Numbers on each of October 16, 2006, and October 17, 2006, respectively. On October 16, 2006, CC-1 purchased 2,000 shares of Trammell Crow shortly after the calls. On October 17, 2006, CC-1 purchased 8,000 shares of Trammell Crow shortly after the first call. On October 19 and 25, 2006, CC-1 purchased an additional 10,000 and 15,000 shares of Trammell Crow, respectively. Thus, CC-1 purchased a total of 35,000 shares of Trammell Crow at prices ranging from $37.50 per share to $38.66 per share, at a total cost of $1,331,892.

c.    On October 31, 2006, CB Richard Ellis Group, Inc. announced it had entered into an agreement to acquire Trammell Crow Company at a price of $49.51 per share. Following the news announcement on that day, CC-1 sold all 35,000 shares of Trammell Crow that he had purchased in advanced of the news announcement at an average price of $48.55 per share, reaping total proceeds of $1,699,377 and total profits of $367,485.

24.    Based on the foregoing, I have probable cause to believe that HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, provided Credit Suisse Inside Information to CC-1 during October 2006 in connection with Credit Suisse's work on a pending acquisition of Trammell Crow Co. by real estate company CB Richard Ellis Group, Inc., and that CC-1 executed trades in the securities of Trammell Crow Co. based on the Credit Suisse Inside Information he obtained from NASEEM.

## Insider Trading In The Securities Of John H. Harland Co. and Caremark RX, Inc.

25.    Based on conversations with the SEC Attorney, who relayed to me information he obtained from a Credit Suisse employee, and my review of the CC-1 Account Records, the Credit Suisse Telephone Summary, and public news announcements, I have learned the following:

       a.   Credit Suisse was engaged to advise: (i) Express Scripts, Inc., a pharmacy benefits manager, in connection with a pending acquisition of Caremark Rx, Inc., and (ii) M&F Worldwide Corp., in connection with a pending acquisition of John H. Harland Co.

       b.   Between December 5 and December 7, 2006, there were telephone calls from the Naseem Telephone Number to the CC-1 Telephone Numbers on 4 separate occasions.  Concomitant with those calls on December 5, 6, and 7, 2006, CC-1 purchased 5,000 shares, 15,000 shares and another 5,000 shares of John Harland, respectively.  These trades were placed within 10 minutes to an hour and a half of the calls from the Naseem Telephone Number to the CC-1 Telephone Numbers.  On December 11, 12, and 13, 2006, CC-1 purchased an additional total of 21,000 shares of John Harland.  Altogether, CC-1 purchased a total of 46,000 shares of John Harland at prices ranging from approximately $42.99 per share to $44.31 per share, at a total cost of approximately $2,008,362.

       c.   On December 20, 2006, it was announced that M&F Worldwide would acquire John Harland for $52.75 per share.  Between December 20 and December 26, 2006, CC-1 sold all 46,000 shares of John Harland he had purchased in advance of the news announcement at an average price of approximately $50.40, reaping total proceeds of approximately $2,315,775 and total profits of approximately $307,061.50.

       d.   On December 13 and 14, 2006, CC-1 purchased a total of 55,000 shares of Caremark Rx, Inc. at prices ranging from approximately $49.85 to $50.77, at a total cost of approximately $2,757,505.

       e.   Prior to the December 18, 2006 open of the stock market, an announcement was issued that Express Scripts Inc., a pharmacy benefits manager, was planning to make an offer for Caremark Rx, Inc. of approximately $58.50 per share.  Following the news announcement, on December 18, 2006, CC-1 sold all 55,000 shares of Caremark Rx, Inc. he had purchased in the period prior to the news announcement, at an average price of approximately $55.50, reaping total proceeds of approximately $3,057,987 and total profits of approximately $297,982.

     26.   Based on the foregoing, I have probable cause to believe that HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, provided Credit Suisse Inside Information to CC-1 during December 2006 in connection with Credit Suisse's work on the pending acquisitions of John H. Harland Co. and Caremark Rx, Inc., and that CC-1

executed trades in the securities of John H. Harland Co. and Caremark Rx, Inc. based on the Credit Suisse Inside Information he obtained from NASEEM.

Insider Trading In The Securities
Of Hydril Company and TXU Corp.

27.    Based on conversations with the SEC Attorney, who relayed to me information he obtained from a Credit Suisse employee, and my review of the CC-1 Account Records, the Credit Suisse Telephone Summary, and public news announcements, I have learned the following:

a.    Credit Suisse was engaged to advise: (i) Hydril Company, in connection with a pending acquisition of Hydril by Tenaris, SA, and (ii) TXU Corp. in connection with a pending acquisition of TXU by a partnership that included private equity firm Kohlberg Kravis & Roberts, and others.

b.    Between February 5, 2007 and 8, 2007 there were several calls from the Naseem Telephone Number to the CC-1 Telephone Numbers.  At or about the time of these phone calls, CC-1 purchased securities in Hydril Company as set forth below:

| Date | Event |
|------|-------|
| February 5, 2007 | Three phone calls from NASEEM to CC-1 |
| February 5, 2007 | CC-1 purchases 15,000 shares of HYDL, 120 February 85 HYDL call options, and 480 March 85 HYDL call options[12] |

---

[12]    A "call option" gives the purchaser the right to buy a certain number of shares (typically 100 shares) of an underlying security at a specified price, until the specified expiration date of the call option.  Thus, a "March 57 1/2 call option" in TXU would provide the purchaser with the right to purchase 100 shares of TXU at a price of $57.50 per share (commonly referred to as the "strike price") at any time until the expiration date of the call option which, in this case, would be a designated time in the month of March.  Call options are themselves securities and typically trade on options exchanges at prices that generally move in tandem with the price of the underlying securities.

| | |
|---|---|
| February 6, 2007 | Phone call from NASEEM to CC-1 |
| February 6, 2007 | CC-1 purchases 6,447 shares of HYDL, 180 February 85 HYDL call options, and 110 March 85 HYDL call options |
| | |
| February 7, 2007 | Phone call from NASEEM to CC-1 |
| February 7, 2007 | CC-1 purchases 3,553 shares of HYDL |
| | |
| February 8, 2007 | Phone call from NASEEM to CC-1 |
| February 8, 2007 | CC-1 purchases 5,000 shares of HYDL and 60 March 85 HYDL call options |
| February 9, 2007 | CC-1 purchases 5,000 shares of HYDL |

    c.    In total, CC-1 purchased 35,000 shares of Hydril Company at prices ranging from $82.86 per share to $84.60 per share at a total cost of approximately $2,933,781. CC-1 also purchased a total of 950 Hydril call options, for a total cost of $357,900.

    d.    On February 12, 2007, Hydril Company and Tenaris S.A., a manufacturer of tubular products and services for the oil and gas industry, jointly announced a merger pursuant to which Tenaris would acquire Hydril for $97 per share. Following the news announcement on that day, CC-1 sold all 35,000 shares of Hydril he had purchased in advance of the news announcement at an average price of $94.92 per share, reaping total proceeds of $3,322,200 and total profits of approximately $388,418. On that same day, CC-1 also sold all 950 Hydril call options, reaping total proceeds of approximately $941,000 and profits of approximately $579,358. CC-1's total profits from trading in Hydril securities amounted to approximately $967,776.

    e.    On February 8, 2007, there was a telephone call from the Naseem Telephone Number to one of the CC-1 Telephone Numbers. On February 23, 2007, CC-1 purchased 3,500 March 57 1/2 call options at prices ranging from $1.60 to $2.45 per option and

3,200 March 60 call options in TXU Corp. at prices ranging from $.70 to $1.65 per option. Also on February 23, 2007, following the above-described options trades, there was another call from the Naseem Telephone Number to one of the CC-1 Telephone Numbers. CC-1's combined total cost of purchasing these 6,700 call options was approximately $1,140,330. In addition, also on February 23, CC-1 purchased 15,000 shares of TXU, at a price of $58.49 per share, for a total cost of $878,890.[13]

       f.    At approximately 4:26 p.m. on Friday, February 23, 2006, following the close of the stock market, a public announcement was released that private equity firm Kohlberg Kravis Roberts & Co. would acquire TXU Corp. in the largest leveraged buyout to date. Then, on the morning of February 26, 2007, prior to the market open, there was a news announcement that Kohlberg, Kravis & Roberts, in a partnership with others, offered to acquire TXU Crop. at a per share price of $69.25. TXU shares, which had closed at $60.44 on February 23, 2007, opened at a price of $67.50 on Monday, February 26, 2007. CC-1 sold all 6,700 options on February 26, 2007, reaping total proceeds of $6,139,600 and total profits of $4,999,270. CC-1 also sold all 15,000 shares of TXU that he had purchased in advance of the news announcement, at an average price of $67.85, reaping total proceeds of $1,016,262 and total profits of approximately $137,371.50. CC-1'S total profits from his insider trading in TXU securities amounted to approximately $5,136,641.50.

     28.    Based on the foregoing, I have probable cause to believe that HAFIZ MUHAMMAD ZUBAIR NASEEM, the defendant, provided Credit Suisse Inside Information to CC-1 during February 2007 in connection with Credit Suisse's work on the pending acquisitions of Hydril Company and TXU Corp., and that CC-1 executed trades in the securities of these companies based on the Credit Suisse Inside Information he obtained from NASEEM.

---

[13]  Based on the information currently available to me I do not know whether the purchase of the 15,000 TXU shares occurred on or before the February 23 call from the Naseem Telephone Number to the CC-1 Telephone Number.

WHEREFORE, deponent prays that arrest warrants be issued for the above-named defendants and that they be imprisoned or bailed as the case may be.

PAUL HIGGINS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
3___ day of May, 2007

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

23

# EXHIBIT B

Approved:

Joshua Klein /Rno

JOSHUA KLEIN
Assistant United States Attorney

Before:     HONORABLE ANDREW J. PECK
            United States Magistrate Judge
            Southern District of New York

**07 MAG    859**

- - - - - - - - - - - - - - - - - - - x
                                      :
UNITED STATES OF AMERICA              :     COMPLAINT
                                      :
         -v.-                         :     Violations of
                                      :     18 U.S.C. § 371;
AJAZ RAHIM,                           :     15 U.S.C. §§ 78j(b),
                                      :     78ff; 17 C.F.R. §§
                                      :     240.10b-5, 240.10b5-
                                      :     2
                                      :
                  Defendant.          :     COUNTY OF OFFENSE:
                                      :     NEW YORK
                                      :
- - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        PAUL HIGGINS, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation and
charges as follows:

### COUNT ONE

(Conspiracy)

        1.   From at least in or about April 2006 up to and
including in or about February 2007, in the Southern District of
New York and elsewhere, AJAZ RAHIM, the defendant, and others
known and unknown, unlawfully, willfully, and knowingly did
combine, conspire, confederate and agree together and with each
other to commit offenses against the United States, to wit,
securities fraud, in violation of Title 15, United States Code,
Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2.

        2.   It was a part and object of the conspiracy that
AJAZ RAHIM, the defendant, and others known and unknown,
unlawfully, willfully and knowingly, directly and indirectly, by
the use of means and instrumentalities of interstate commerce, and

of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon the purchaser and seller, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Overt Acts

3.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   At certain times during 2006, Credit Suisse Securities, USA, LLC ("Credit Suisse") was engaged to advise a company called Northwestern Corporation (doing business as "Northwestern Energy"), a public company whose stock is traded on the NASDAQ under the symbol "NWEC," on a pending acquisition by an Australian utility infrastructure company called Babcock & Brown Infrastructure;

b.   On or about Friday, April 21, 2006, a telephone call was made from a Credit Suisse telephone in New York, New York that was assigned to Hafiz Muhammad Zubair Naseem, an investment banker employed by Credit Suisse and a co-conspirator not named herein as a defendant, to a telephone associated with AJAZ RAHIM, the defendant;[1]

c.   On or about Monday, April 24, 2006, a telephone call was made from the Credit Suisse phone assigned to Naseem to a phone associated with RAHIM;

d.   On or about April 24, 2006, following the telephone call from the Credit Suisse phone assigned to Naseem to

---

[1]   Paragraph 14 below explains, in greater detail, the basis for my knowledge that the telephone calls at issue emanated from a phone assigned to Naseem and were placed to a phone associated with RAHIM.

a phone associated with RAHIM, RAHIM purchased 16,000 shares of stock in Northwestern Corporation at a cost of between $31.04 and $31.69 per share, for a total cost of approximately $508,788;

        e.  On or about April 25, 2006 Northwestern Corporation announced that the company had reached a definitive agreement with Babcock & Brown Infrastructure, a utility infrastructure company based in Sydney, Australia, (which trades on the Australian Stock Exchange under the symbol "BBI") pursuant to which Babcock would acquire Northwestern Corporation in an all cash transaction at $37 per share;

        f.  On or about April 26, 2006, RAHIM sold 16,000 shares in Northwestern, at an average price of approximately $35.05 per share, reaping total proceeds of approximately $560,800 and a profit of approximately $53,760;[2]

        g.  On or about June 20, 2006, RAHIM purchased 1,000 shares of stock in Veritas DGC, Inc.

        h.  On or about July 21, 2006, RAHIM purchased 2,000 shares of stock in Energy Partners, Ltd.

        i.  On or about September 13, 2006, RAHIM purchased 5,000 shares of stock in Jacuzzi Brands, Inc.

        j.  On or about October 16, 2006, RAHIM purchased 2,000 shares of stock in Tramell Crow Co.

        k.  On or about December 5, 2006, RAHIM purchased 5,000 shares of stock in John H. Harland Co.

        l.  On or about February 5, 2007, RAHIM purchased 15,000 shares of stock in Hydril Company.

        m.  On or about February 23, 2007, RAHIM purchased 15,000 shares of stock in TXU Corp.

        (Title 18, United States Code, Section 371.)

---

    [2]  RAHIM also purchased an additional 4,000 shares of Northwestern Corporation earlier in April 2006, following telephone calls from the Credit Suisse phone assigned to Naseem to the telephone numbers associated with RAHIM. RAHIM sold these 4,000 shares of Northwestern Corporation on April 26, 2006, along with the 16,000 shares described above for an additional profit of approximately $15,880.

## COUNTS TWO THROUGH TWENTY-SIX

(Securities Fraud)

4.    On or about the dates set forth below, in the Southern District of New York and elsewhere, AJAZ RAHIM, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, RAHIM executed the securities transactions listed below based on material, nonpublic information he obtained from Hafiz Muhammad Zubair Naseem.

| COUNT | DATE | SECURITY | TRANSACTION |
|-------|------|----------|-------------|
| TWO | April 6, 2006 | Northwestern Corporation | purchased 2,000 shares |
| THREE | April 7, 2006 | Northwestern Corporation | purchased 2,000 shares |
| FOUR | April 24, 2006 | Northwestern Corporation | purchased 16,000 shares |
| FIVE | June 20, 2006 | Veritas DGC, Inc. | purchased 1,000 shares |
| SIX | July 5, 2006 | Veritas DGC, Inc. | purchased 1,000 shares |
| SEVEN | July 5, 2006 | Veritas DGC, Inc. | purchased 500 shares |
| EIGHT | July 10, 2006 | Veritas DGC, Inc. | purchased 1,000 shares |
| NINE | July 21, 2006 | Veritas DGC, Inc. | purchased 1,000 shares |
| TEN | July 21, 2006 | Energy Partners, Ltd. | purchased 1,000 shares |

| ELEVEN | July 25, 2006 | Energy Partners, Ltd. | purchased 2,000 shares |
|---|---|---|---|
| TWELVE | July 26, 2006 | Energy Partners, Ltd. | purchased 2000 shares |
| THIRTEEN | July 27, 2006 | Energy Partners, Ltd. | purchased 3,000 shares |
| FOURTEEN | July 27, 2006 | Energy Partners, Ltd. | purchased 3,000 shares |
| FIFTEEN | August 31, 2006 | Veritas DGC, Inc. | purchased 6,000 shares |
| SIXTEEN | September 13, 2006 | Jacuzzi Brands, Inc. | purchased 5,000 shares |
| SEVENTEEN | September 15, 2006 | Jacuzzi Brands, Inc. | purchased 20,000 shares |
| EIGHTEEN | September 20, 2006 | Jacuzzi Brands, Inc. | purchased 5,000 shares |
| NINETEEN | October 9, 2006 | Jacuzzi Brands, Inc. | purchased 5,000 shares |
| TWENTY | October 16, 2006 | Tramell Crow Company | purchased 2,000 shares |
| TWENTY-ONE | October 17, 2006 | Tramell Crow Company | purchased 8,000 shares |
| TWENTY-TWO | December 5, 2006 | John H. Harland Co. | purchased 5,000 shares |
| TWENTY-THREE | December 6, 2006 | John H. Harland Co. | purchased 15,000 shares |
| TWENTY-FOUR | December 7, 2006 | John H. Harland Co. | purchased 5,000 shares |
| TWENTY-FIVE | February 5, 2007 | Hydril Company | purchased 15,000 shares |
| TWENTY-SIX | February 8, 2007 | Hydril Company | purchased 5,000 shares |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2, and Title 18, United States Code, Section 2).

The basis for my knowledge and the foregoing charge is, in part, as follows:

5.    I have been a Special Agent with the Federal Bureau of Investigation for approximately seventeen years.  I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses.  I have participated in numerous investigations of such offenses, and I have made and participated in making arrests of numerous individuals for participating in such offenses.

6.    The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including: (a) information provided to me by the United States Securities and Exchange Commission (the "SEC"), which includes information obtained from the New York Stock Exchange ("NYSE"), the Chicago Board of Options Exchange ("CBOE"), and Credit Suisse; (b) business records and other documents obtained from various entities, including Credit Suisse and certain other broker-dealers; and (c) publicly-available documents.  Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation.  Where conversations and events are referred to herein, they are related in substance and in part.  Where figures and calculations are set forth herein, they are approximate.

## Relevant Entities and Individuals

7.    Based on information obtained from the SEC (including information provided to the SEC by Credit Suisse), documents publicly filed with the SEC, and public announcements made by certain of the entities identified below, I am aware of the following:

a.    At all times relevant to this Complaint, Credit Suisse, a wholly owned subsidiary of Credit Suisse Bank, operated as an investment bank and broker-dealer, located in New York, New York.  At all times relevant to this Complaint, a significant portion of Credit Suisse's business was devoted to advising corporations on various financings and business related transactions.

b.    At all times relevant to this Complaint, Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, and a Pakistani national working in the United States, was employed by Credit Suisse in the firm's Investment Banking

6

Division, in the Global Energy Group.

      c.   At all times relevant to this complaint AJAZ RAHIM, the defendant, was employed as Country Head of Investment Banking at Faysal Bank, a financial institution located in Pakistan.

      d.   At certain times relevant to this Complaint, Northwestern Corporation (doing business as Northwestern Energy), a public company whose stock traded on the NASDAQ under the symbol "NWEC," operated as a provider of electricity and natural gas in the upper midwest and northwest.

      e.   At certain times relevant to this Complaint, Energy Partners, Ltd., whose stock traded on the NYSE under the symbol "EPL," operated as an independent oil and natural gas exploration and production company.

      f.   At certain times relevant to this Complaint, Veritas DGC Inc., a public company whose stock traded on the NYSE under the symbol "VTS," operated as a provider of integrated geophysical information and services to the petroleum industry worldwide.

      g.   At certain times relevant to this Complaint, Jacuzzi Brands, Inc., a public company whose stock traded on the NYSE under the symbol "JJZ," operated as a manufacturer and distributor of branded bath and plumbing products for the residential, commercial and institutional markets.

      h.   At certain times relevant to this Complaint, Trammell Crow Co., a public company whose stock traded on the NYSE under the symbol "TCC," operated a property management business.

      i.   At certain times relevant to this Complaint, Caremark RX, Inc., a public company whose stock traded on the NYSE under the symbol "CMX," operated as a pharmacy benefits management company.

      j.   At certain times relevant to this Complaint, John H. Harland Co., a public company whose stock traded on the NYSE under the symbol "JH," operated as a provider of printed products and software and related services sold to the financial institution market.

7

k.    At certain times relevant to this Complaint, Hydril Company, a public company whose stock traded on the NASDAQ market under the symbol "HYDL," operated as a manufacturer of premium connections and pressure control products for oil and gas drilling production.

l.    At certain times relevant to this Complaint, TXU Corp., a public company whose stock traded on the NYSE under the symbol "TXU," operated as the largest electricity producer in Texas.

## Credit Suisse's Confidentiality Policy

8.    Based on information obtained from Credit Suisse, I am aware that at all times relevant to this Complaint, Credit Suisse maintained written policies prohibiting the premature dissemination of material non-public and confidential information relating to pending transactions and financings in which Credit Suisse was involved.    At or about the time Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, commenced his employment at Credit Suisse, he was provided with a copy of Credit Suisse's "Global Business Conduct Manual," and certified that he had read the document.    Naseem also signed a "Confidential Information and Proprietary Information Acknowledgment" in which he specifically acknowledged his understanding of various Credit Suisse policies and his obligation to comport with these policies as a Credit Suisse employee.    Among other things, Naseem acknowledged that:

> I understand it is a criminal offense to trade or encourage others to trade on inside information.    I also may face civil liability and regulatory sanctions for disclosing or using Confidential and Proprietary information inappropriately.

9.    The Global Business Conduct Manual defined "inside information" as information that "relates to the securities of an issuer or group of issuers, is not publicly known and is material."    The Manual defined as "material for this purpose" information that "if made public, would likely have a significant impact on the price of the security, or a reasonable investor would consider important in deciding whether to purchase, hold or sell the security."

8

10.    Furthermore, the Global Business Conduct Manual specifically admonished that "if you have inside information, you generally may not trade or deal in the securities in question, encourage others to trade or deal in the securities in question, or reveal or 'tip' the information to another person, other than in the proper performance of your job."

11.    Finally, the Global Business Conduct Manual warned that "failure to strictly observe the laws and rules regarding inside information is a criminal offense in many jurisdictions where Credit Suisse conducts business."

### Insider Trading Scheme

#### General Overview

12.    Based on all of the sources of information referenced herein, including all of the facts and circumstances described in detail below, I have probable cause to believe the following:

a.    From in or about April 2006 through in or about February 2007, AJAZ RAHIM, the defendant, and Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, and others, known and unknown, participated in a scheme to defraud by executing securities transactions based on material, nonpublic information regarding forthcoming announcements relating to acquisitions of the following nine publicly traded companies: Northwestern Corporation ("NWEC"), Energy Partners, Ltd. ("EPL"), Veritas DGC Inc. ("VTS"), Jacuzzi Brands, Inc. ("JJZ"), Trammell Crow Co. ("TCC"), Hydril Company ("HYDL"), Caremark RX, Inc. ("CMX"), John H. Harland Co. ("JH"), and TXU Corp. ("TXU") (these companies are collectively referred to as the "Issuers" and the securities in these companies are collectively referred to as the "Subject Securities").

b.    Credit Suisse was engaged to advise either the target company or the acquiring entity in connection with business combination transactions involving the Issuers (the "Subject Transactions"). Naseem, who was a member of Credit Suisse's Global Energy Group, worked at a desk at Credit Suisse's offices in New York, New York, that was situated in close proximity to other members of the Global Energy Group. Because many of the Subject Transactions were staffed by members of the Global Energy Group, Naseem had access to information about these transactions by virtue of his membership in the Global Energy Group. Furthermore, Naseem had accessed an internal Credit Suisse database that contained information about certain of these

9

transactions.

        c.    Naseem regularly and repeatedly called AJAZ
RAHIM, the defendant, and provided him with material non-public
information regarding the Subject Transactions (the "Credit Suisse
Inside Information") in violation of (a) the duties of trust and
confidence owed by Naseem to Credit Suisse and its clients, and
(b) Credit Suisse's written policies regarding the use and
safekeeping of confidential and inside information.

        d.    The means by which Naseem and RAHIM
effectuated the fraudulent scheme were as follows: Naseem would
typically call RAHIM at his home or on RAHIM's cell phone in
advance of a public announcement that a particular Issuer was to
be acquired by another entity and he would provide Credit Suisse
Inside Information to RAHIM regarding the acquisition in
question.[3]  Shortly after receiving such a call RAHIM would
purchase securities in that Issuer based on the Credit Suisse
Inside Information he received from Naseem.  Following public
disclosure that an Issuer was being acquired -- which always
occurred after RAHIM had already purchased securities in that
particular Issuer -- RAHIM would quickly sell all of the
securities he had purchased in advance of the public disclosures.
RAHIM executed dozens of securities transactions, including trades
in an offshore account, based on Credit Suisse Inside Information
and profited from his trading in each of the Subject Securities.
RAHIM earned total profits in excess of $7.5 million from the
scheme.

Insider Trading In The Securities Of Northwestern Corporation

        13.    Based on conversations with an SEC attorney (the
"SEC Attorney"), who relayed to me information he obtained from a
Credit Suisse employee,[4] I have learned that Credit Suisse was
engaged to advise Northwestern Corporation in connection with a

---

        [3]  Based on conversations with an SEC Attorney, who relayed
to me information he obtained from an employee of Credit Suisse,
I have learned that during all times relevant to this Complaint,
Credit Suisse had no business relationship with RAHIM or his
employer.

        [4]  I have spoken with the SEC Attorney on multiple occasions
in connection with this investigation.  During the course of
these conversations, the SEC Attorney relayed to me, among other
things, information he obtained from a Credit Suisse employee,
and information he obtained from the CBOE and the NYSE.

10

pending acquisition of Northwestern Corporation by an Australian utility infrastructure company called Babcock & Brown Infrastructure.

14.    Based on my review of brokerage account records for AJAZ RAHIM, the defendant (the "Rahim Account Records"), I have learned that RAHIM provided two telephone numbers to a broker dealer which he described as the telephone numbers for his cell phone and residence (the "Rahim Telephone Numbers"). Based on a conversation with the SEC Attorney, who relayed to me information he obtained from a Credit Suisse employee, I know that Credit Suisse assigned a particular office telephone number to Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, which number remained assigned to Naseem during all times relevant to this Complaint (the "Naseem Telephone Number").

15.    Based on my review of a summary of telephone records that was provided by Credit Suisse (the "Credit Suisse Telephone Summary") and the Rahim Account Records, I have learned that between April 5, 2006 and April 24, 2006, there were 11 telephone calls made from the Naseem Telephone Number to the Rahim Telephone Numbers, including, among others, calls on April 6, April 7, and April 24. AJAZ RAHIM, the defendant, purchased a total of 20,000 shares of Northwestern Corporation on those very same dates -- April 6, April 7, and April 24[5] -- at a price per share that ranged from $31.04 to $31.69, for a total cost of approximately $631,360. Set forth below are the times at which these trades were executed[6] relative to the times on which RAHIM spoke to Naseem on April 6, 7, and 24:

| Date | Event |
|---|---|
| April 6, 2006 | 9:38 a.m. call from Naseem to RAHIM[7] |

---

[5]    RAHIM purchased 2,000 shares on April 6, 2,000 shares on April 7, and 16,000 shares on April 24.

[6]    Based on my review of the Rahim Account Records, and information I obtained from the SEC Attorney, it appears that a substantial portion of the stock trades described herein were executed on the NYSE in New York, New York.

[7]    The phrase "call from Naseem to RAHIM" as it appears throughout various charts in this Complaint is intended as shorthand to denote an entry on the Credit Suisse Telephone Summary of a call from the Naseem Telephone Number to one of the

| April 6, 2006 | 10:25 a.m. RAHIM purchases 2,000 shares of NWEC |
|---|---|
| April 7, 2006 | 9:30 a.m. call from Naseem to RAHIM |
| April 7, 2006 | 10:06 a.m. RAHIM purchases 2,000 shares of NWEC |
|  |  |
| April 24, 2006 | 2:32 p.m. call from Naseem to RAHIM |
| April 24, 2006 | 2:43 p.m.  RAHIM purchases 16,000 shares of NWEC |
| April 24, 2006 | 2:46 p.m. call from Naseem to RAHIM |

16.    Based on conversations with the SEC Attorney, my review of news reports, and the Rahim Account Records, I have learned that on April 25, 2006, the Board of Directors of Northwestern Corporation announced that the company had reached a "definitive agreement" with Babcock & Brown Infrastructure under which Babcock & Brown would acquire Northwestern in an all cash transaction for $37 per share.  On April 26, 2006, RAHIM sold all 20,000 shares of Northwestern Corporation that he had purchased in the days preceding the April 25 news announcement at an average price of approximately $35.05 per share, reaping total proceeds of $701,000.  RAHIM earned profits of approximately $69,640 from the sale of his Northwestern Corporation securities.

17.    In addition, based on my review of Credit Suisse documents, including emails dated May 24, 2006 and May 25, 2006, it appears that shortly after the Northwestern Corporation transaction, Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, sought to open an account at a financial institution that I believe to be located in Pakistan, and to authorize AJAZ RAHIM, the defendant, to operate the account.  Specifically, Naseem provided an account opening document to an individual at this financial institution which listed RAHIM as a person authorized to operate the account. Furthermore, Naseem stated in one of the emails I reviewed that he had "authorized Ajaz to manage" the account.  After confirming that RAHIM "can do whatever he wants" Naseem concluded one of the

---

Rahim Telephone Numbers.

emails with the comment "let the fun begin." I have not obtained
account records pertaining to this account and therefore do not
know what, if any, trading occurred in this account.

18.   Based on the foregoing, I have probable cause to
believe that AJAZ RAHIM, the defendant, obtained Credit Suisse
Inside Information from Hafiz Muhammad Zubair Naseem, a co-
conspirator not named herein as a defendant, in or about April
2006 in connection with the pending acquisition of Northwestern
Corporation and that RAHIM executed trades in the securities of
Northwestern Corporation based on the Credit Suisse Inside
Information he obtained from Naseem.

### Insider Trading In The Securities Of Veritas DGC, Inc. and Energy Partners, Ltd.

19.   Based on conversations with the SEC Attorney, who
relayed to me information he obtained from a Credit Suisse
employee, and my review of the Rahim Account Records, the Credit
Suisse Telephone Summary, and public news announcements, I have
learned the following:

a.    Credit Suisse was engaged to advise: (i)
Compagnie Generale de Geophysique, SA, a French surveyor of oil
and gas fields, in connection with a pending acquisition of
Veritas DGC, Inc., and (ii) Stone Energy Corporation in connection
with a pending acquisition of Energy Partners, Ltd.

b.    Between June 2006 and September 2006 there
were numerous telephone calls from the Naseem Telephone Number to
the Rahim Telephone Numbers. At or about the time of many of
these calls, AJAZ RAHIM, the defendant, purchased securities in
Veritas DGC and Energy Partners, Ltd., as set forth below:

| Date | Event[8] |
|---|---|
| June 20, 2006 | 12:37 p.m. phone call from Naseem to RAHIM |
| June 20, 2006 | 12:48 p.m. RAHIM purchases 1,000 shares of VTS |
| | |

---

[8]   The telephone traffic between Naseem and RAHIM during
this time frame exceeded the specific calls identified in this
chart.

| | |
|---|---|
| July 5, 2006 | 10:17 a.m. phone call from Naseem to RAHIM |
| July 5, 2006 | 10:59 a.m. RAHIM purchases 1,000 shares of VTS |
| July 5, 2006 | 11:36 a.m. phone call from Naseem to RAHIM |
| July 5, 2006 | 11:44 a.m. RAHIM purchases 500 shares of VTS |
| | |
| July 10, 2006 | 9:25 a.m. phone call from Naseem to RAHIM |
| July 10, 2006 | 11:09 a.m. phone call from Naseem to RAHIM |
| July 10, 2006 | 11:11 a.m. phone call from Naseem to RAHIM |
| July 10, 2006 | 12:29 p.m. RAHIM purchases 1,000 shares of VTS |
| | |
| July 21, 2006 | 10:11 a.m. phone call from Naseem to RAHIM |
| July 21, 2006 | 11:47 a.m. phone call from Naseem to RAHIM |
| July 21, 2006 | 11:53 a.m. RAHIM purchases 1,000 shares of VTS and 2,000 shares of EPL |
| | |
| July 25, 2006 | 10:28 a.m. phone call from Naseem to RAHIM |
| July 25, 2006 | 11:27 a.m. phone call from Naseem to RAHIM |
| July 25, 2006 | 11:36 A.M. RAHIM purchases 2,000 shares of EPL |
| | |
| July 26, 2006 | 12:31 p.m. phone call from Naseem to RAHIM |

14

| July 26, 2006 | 1:56 p.m. phone call from Naseem to RAHIM |
| July 26, 2006 | 2:02 p.m. RAHIM purchases 2,000 shares of EPL |
| | |
| July 27, 2006 | 9:54 a.m. phone call from Naseem to RAHIM |
| July 27, 2006 | 9:59 a.m. RAHIM purchases 3,000 shares of EPL |
| July 27, 2006 | 2:41 p.m. phone call from Naseem to RAHIM |
| July 27, 2006 | 3:41 p.m. RAHIM purchases 3,000 shares of EPL |

      c.    In addition to RAHIM's purchases of Veritas DGC, Inc. and Energy Partners, Ltd. securities as set forth above, RAHIM purchased an additional 8,000 shares of Energy Partners, Ltd. between August 2, 2006 and August 22, 2006, thereby bringing the total of Energy Partners shares purchased to 20,000.  These shares were purchased at prices that ranged from approximately $16.70 per share to approximately $18.83 per share, for a total cost of approximately $358,709.

      d.    On August 25, 2006, Energy Partners, Ltd. and Stone Energy Corporation, an oil and gas company, announced a proposed merger of their companies.  On August 28, 2006, RAHIM sold all 20,000 shares of Energy Partners he had accumulated prior to the news announcement at an average price of $24.50 per share, thus reaping total proceeds of $490,000 and profits of approximately $131,290 from the sale of these securities.

      e.    Between August 11, 2006 and August 31, 2006, RAHIM purchased an additional 20,500 shares of Veritas DGC, Inc., thereby bringing the total of Veritas shares purchased to 25,000. These shares were purchased at prices that ranged from approximately $46.40 per share to approximately $60.62 per share, at a total cost of approximately $1,399,765.[9]

---

[9]  6,000 of these additional shares were purchased on August 31, 2006, a date on which there were two calls from the Naseem Telephone Number to the Rahim Telephone Numbers, including a call approximately a half hour prior to the trade.

f.   On September 5, 2006, Compagnie Generale de Geophysique SA announced that it planned to acquire Veritas DGC Inc. for $75 per share in stock and cash.  Following the news announcement on that day, RAHIM sold 15,000 shares of Veritas DGC, Inc., at an average price of approximately $70.03 per share.  The next day RAHIM sold his remaining 10,000 shares of Veritas at an average price per share of approximately $70.50 per share.  RAHIM reaped total proceeds of approximately $1,755,451.50, and total profits of approximately $355,686.50 from the sale of his Veritas shares.

20.   Based on the foregoing, I have probable cause to believe that AJAZ RAHIM, the defendant, obtained Credit Suisse Inside Information from Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, from in or about June 2006 through in or about September 2006 in connection with (i) Credit Suisse's work on the pending acquisition of Veritas DGC, Inc. by Compagnie Generale de Geophysicque, SA, and (ii) the merger of Energy Partners, Ltd., with Stone Energy Corporation, and that RAHIM executed trades in the securities of Veritas DGC, Inc. and Energy Partners, Ltd. based on the Credit Suisse Inside Information he obtained from Naseem.

## Insider Trading In The Securities Of Jacuzzi Brands, Inc.

21.   Based on conversations with the SEC Attorney, who relayed to me information he obtained from a Credit Suisse employee, and my review of the Rahim Account Records, the Credit Suisse Telephone Summary, and public news announcements, I have learned the following:

a.   Credit Suisse was engaged to advise private equity firm Apollo Management L.P. in connection with an acquisition of Jacuzzi Brands, Inc.

b.   Between September 6, 2006 and October 11, 2006, there were numerous telephone calls from the Naseem Telephone Number to the Rahim Telephone Numbers.  At or about the time of many of these calls, AJAZ RAHIM, the defendant, purchased stock in Jacuzzi Brands, Inc. as set forth below:

| Date | Event |
|---|---|
| September 13, 2006 | 9:36 a.m. phone call from Naseem to RAHIM |
| September 13, 2006 | 9:44 a.m. RAHIM purchases 5,000 shares of JJZ |

| | |
|---|---|
| September 15, 2006 | 10:16 a.m. phone call from Naseem to RAHIM |
| September 15, 2006 | 12:05 p.m. phone call from Naseem to RAHIM |
| September 15, 2006 | 12:15 p.m. RAHIM purchases 20,000 shares of JJZ |
| | |
| September 20, 2006 | 10:11 a.m. phone call from Naseem to RAHIM |
| September 20, 2006 | 10:23 a.m. RAHIM purchases 5,000 shares of JJZ |
| | |
| October 9, 2006 | 9:59 a.m. phone call from Naseem to RAHIM |
| October 9, 2006 | 10:05 a.m. RAHIM purchases 5,000 shares of JJZ |

c.    As discussed above, RAHIM purchased a total of 35,000 shares of Jacuzzi Brands, Inc.  These purchases were made at prices ranging from $10.28 per share to $10.60 per share, for a total cost of approximately $361,524.

d.    On October 11, 2006,[10] Jacuzzi Brands, Inc. announced that Apollo Management L.P. would purchase the company at a price of $12.50 per share.  Following the news announcement on that day RAHIM sold all 35,000 shares of Jacuzzi Brands that he had purchased in advance of the news announcement, at an average price of $12.03 per share.  RAHIM reaped total proceeds of $421,050, and total profits of $59,526 from the sale of his Jacuzzi Brands shares.

22.    Based on the foregoing, I have probable cause to believe that AJAZ RAHIM, the defendant, obtained Credit Suisse Inside Information from Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, from in or about September 2006 through in or about October 2006, in connection

---

[10]    There were two calls from Naseem's secretary's telephone to the Rahim Telephone Numbers on October 11, 2006.

with Credit Suisse's work on the pending acquisition of Jacuzzi
Brands, Inc. by Apollo Management L.P., and that RAHIM executed
trades in the securities of Jacuzzi Brands, Inc. based on the
Credit Suisse Inside Information he obtained from Naseem.

<u>Insider Trading In The Securities Of Trammell Crow Company</u>

23.  Based on conversations with the SEC Attorney, who
relayed to me information obtained from a Credit Suisse employee,
and my review of the Rahim Account Records, the Credit Suisse
Telephone Summary, and public news announcements, I have learned
the following:

a.    Credit Suisse was retained to advise real
estate company CB Richard Ellis Group, Inc. in connection with a
pending acquisition of Trammell Crow Co.

b.    There were two telephone calls from the Naseem
Telephone Number to the Rahim Telephone Numbers on each of October
16, 2006, and October 17, 2006, respectively.  On October 16,
2006, AJAZ RAHIM, the defendant, purchased 2,000 shares of
Trammell Crow shortly after the calls.  On October 17, 2006, RAHIM
purchased 8,000 shares of Trammell Crow shortly after the first
call.  On October 19 and 25, 2006, RAHIM purchased an additional
10,000 and 15,000 shares of Trammell Crow, respectively.  Thus,
RAHIM purchased a total of 35,000 shares of Trammell Crow at
prices ranging from $37.50 per share to $38.66 per share, at a
total cost of $1,331,892.

c.    On October 31, 2006, CB Richard Ellis Group,
Inc. announced it had entered into an agreement to acquire
Trammell Crow Company at a price of $49.51 per share.  Following
the news announcement on that day, RAHIM sold all 35,000 shares of
Trammell Crow that he had purchased in advanced of the news
announcement at an average price of $48.55 per share, reaping
total proceeds of $1,699,377 and total profits of $367,485.

24.    Based on the foregoing, I have probable cause to
believe that AJAZ RAHIM, the defendant, obtained Credit Suisse
Inside Information from Hafiz Muhammad Zubair Naseem, a co-
conspirator not named herein as a defendant, during October 2006
in connection with Credit Suisse's work on a pending acquisition
of Trammell Crow Co. by real estate company CB Richard Ellis
Group, Inc., and that RAHIM executed trades in the securities of
Trammell Crow Co. based on the Credit Suisse Inside Information he
obtained from Naseem.

<u>Insider Trading In The Securities Of</u>
<u>John H. Harland Co. and Caremark RX, Inc.</u>

25.    Based on conversations with the SEC Attorney, who
relayed to me information he obtained from a Credit Suisse
employee, and my review of the Rahim Account Records, the Credit
Suisse Telephone Summary, and public news announcements, I have
learned the following:

a.    Credit Suisse was engaged to advise: (i)
Express Scripts, Inc., a pharmacy benefits manager, in connection
with a pending acquisition of Caremark Rx, Inc., and (ii) M&F
Worldwide Corp., in connection with a pending acquisition of John
H. Harland Co.

b.    Between December 5 and December 7, 2006, there
were telephone calls from the Naseem Telephone Number to the Rahim
Telephone Numbers on 4 separate occasions.  Concomitant with those
calls on December 5, 6, and 7, 2006, AJAZ RAHIM, the defendant,
purchased 5,000 shares, 15,000 shares and another 5,000 shares of
John Harland, respectively.  These trades were placed within 10
minutes to an hour and a half of the calls from the Naseem
Telephone Number to the Rahim Telephone Numbers.  On December 11,
12, and 13, 2006, RAHIM purchased an additional total of 21,000
shares of John Harland.  Altogether, RAHIM purchased a total of
46,000 shares of John Harland at prices ranging from approximately
$42.99 per share to $44.31 per share, at a total cost of
approximately $2,008,362.

c.    On December 20, 2006, it was announced that
M&F Worldwide would acquire John Harland for $52.75 per share.
Between December 20 and December 26, 2006, RAHIM sold all 46,000
shares of John Harland he had purchased in advance of the news
announcement at an average price of approximately $50.40, reaping
total proceeds of approximately $2,315,775 and total profits of
approximately $307,061.50.

d.    On December 13 and 14, 2006, RAHIM purchased a
total of 55,000 shares of Caremark Rx, Inc. at prices ranging from
approximately $49.85 to $50.77, at a total cost of approximately
$2,757,505.

e.    Prior to the December 18, 2006 open of the
stock market, an announcement was issued that Express Scripts
Inc., a pharmacy benefits manager, was planning to make an offer
for Caremark Rx, Inc. of approximately $58.50 per share.
Following the news announcement, on December 18, 2006, RAHIM sold
all 55,000 shares of Caremark Rx, Inc. he had purchased in the

period prior to the news announcement, at an average price of approximately $55.50, reaping total proceeds of approximately $3,057,987 and total profits of approximately $297,982.

26.    Based on the foregoing, I have probable cause to believe that AJAZ RAHIM, the defendant, obtained Credit Suisse Inside Information from Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, during December 2006 in connection with Credit Suisse's work on the pending acquisitions of John H. Harland Co. and Caremark Rx, Inc., and that RHAIM executed trades in the securities of John H. Harland Co. and Caremark Rx, Inc. based on the Credit Suisse Inside Information he obtained from Naseem.

<u>Insider Trading In The Securities
Of Hydril Company and TXU Corp.</u>

27.    Based on conversations with the SEC Attorney, who relayed to me information he obtained from a Credit Suisse employee, and my review of the Rahim Account Records, the Credit Suisse Telephone Summary, and public news announcements, I have learned the following:

a.    Credit Suisse was engaged to advise: (i) Hydril Company, in connection with a pending acquisition of Hydril by Tenaris, SA, and (ii) TXU Corp. in connection with a pending acquisition of TXU by a partnership that included private equity firm Kohlberg Kravis & Roberts, and others.

b.    Between February 5 and February 8, 2007 there were several calls from the Naseem Telephone Number to the Rahim Telephone Numbers.  At or about the time of these phone calls, AJAZ RAHIM, the defendant, purchased securities in Hydril Company as set forth below:

| Date | Event |
|------|-------|
| February 5, 2007 | Three phone calls from Naseem to RAHIM |
| February 5, 2007 | RAHIM purchases 15,000 shares of HYDL, 120 February 85 HYDL call options, and 480 March 85 HYDL call options[11] |

---

[11]    A "call option" gives the purchaser the right to buy a certain number of shares (typically 100 shares) of an underlying

| | |
|---|---|
| February 6, 2007 | Phone call from Naseem to RAHIM |
| February 6, 2007 | RAHIM purchases 6,447 shares of HYDL, 180 February 85 HYDL call options, and 110 March 85 HYDL call options |
| | |
| February 7, 2007 | Phone call from Naseem to RAHIM |
| February 7, 2007 | RAHIM purchases 3,553 shares of HYDL |
| | |
| February 8, 2007 | Phone call from Naseem to RAHIM |
| February 8, 2007 | RAHIM purchases 5,000 shares of HYDL and 60 March 85 HYDL call options |
| February 9, 2007 | RAHIM purchases 5,000 shares of HYDL |

c.    In total, RAHIM purchased 35,000 shares of Hydril Company at prices ranging from $82.86 per share to $84.60 per share at a total cost of approximately $2,933,781.  RAHIM also purchased a total of 950 Hydril call options, for a total cost of $357,900.

d.    On February 12, 2007, Hydril Company and Tenaris S.A., a manufacturer of tubular products and services for the oil and gas industry, jointly announced a merger pursuant to which Tenaris would acquire Hydril for $97 per share.  Following the news announcement on that day, RAHIM sold all 35,000 shares of

---

security at a specified price, until the specified expiration date of the call option.  Thus, a "March 57 1/2 call option" in TXU would provide the purchaser with the right to purchase 100 shares of TXU at a price of $57.50 per share (commonly referred to as the "strike price") at any time until the expiration date of the call option which, in this case, would be a designated time in the month of March.  Call options are themselves securities and typically trade on options exchanges at prices that generally move in tandem with the price of the underlying securities.

Hydril he had purchased in advance of the news announcement at an average price of $94.92 per share, reaping total proceeds of $3,322,200 and total profits of approximately $388,418.  On that same day, RAHIM also sold all 950 Hydril call options, reaping total proceeds of approximately $941,000 and profits of approximately $579,358.  RAHIM's total profits from trading in Hydril securities amounted to approximately $967,776.

   e. On February 8, 2007, there was a telephone call from the Naseem Telephone Number to one of the RAHIM Telephone Numbers.  On February 23, 2007, RAHIM purchased 3,500 March 57 1/2 call options at prices ranging from $1.60 to $2.45 per option and 3,200 March 60 call options in TXU Corp. at prices ranging from $.70 to $1.65 per option.  Also on February 23, 2007, following the above-described options trades, there was another call from the Naseem Telephone Number to one of the Rahim Telephone Numbers.  RAHIM's combined total cost of purchasing these 6,700 call options was approximately $1,140,330.  In addition, also on February 23, RAHIM purchased 15,000 shares of TXU, at a price of $58.49 per share, for a total cost of $878,890.[12]

   f. At approximately 4:26 p.m. on Friday, February 23, 2006, following the close of the stock market, a public announcement was released that private equity firm Kohlberg Kravis Roberts & Co. would acquire TXU Corp. in the largest leveraged buyout to date.  Then, on the morning of February 26, 2007, prior to the market open, there was a news announcement that Kohlberg, Kravis & Roberts, in a partnership with others, offered to acquire TXU Crop. at a per share price of $69.25.  TXU shares, which had closed at $60.44 on February 23, 2007, opened at a price of $67.50 on Monday, February 26, 2007.  RAHIM sold all 6,700 options on February 26, 2007, reaping total proceeds of $6,139,600 and total profits of $4,999,270.  RAHIM also sold all 15,000 shares of TXU that he had purchased in advance of the news announcement, at an average price of $67.85, reaping total proceeds of $1,016,262 and total profits of approximately $137,371.50.  RAHIM's total profits from his insider trading in TXU securities amounted to approximately $5,136,641.50.

---

   [12] Based on the information currently available to me I do not know whether the purchase of the 15,000 TXU shares occurred on or before the February 23 call from the Naseem Telephone Number to the Rahim Telephone Number.

28.   Based on the foregoing, I have probable cause to believe that AJAZ RAHIM, the defendant, obtained Credit Suisse Inside Information from Hafiz Muhammad Zubair Naseem, a co-conspirator not named herein as a defendant, during February 2007 in connection with Credit Suisse's work on the pending acquisitions of Hydril Company and TXU Corp., and that RAHIM executed trades in the securities of these companies based on the Credit Suisse Inside Information he obtained from Naseem.

WHEREFORE, deponent prays that an arrest warrant be issued for the above-named defendant and that he be imprisoned or bailed as the case may be.

PAUL HIGGINS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
____day of May, 2007

MAY 2 9 2007

s/ Andrew J. Peck
HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

23